**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Tina Salata, parent on behalf of E.D., a minor student,

Plaintiff,

v.

Mesa Unified School District,

Defendant.

No. CV-24-01671-PHX-GMS

**ORDER**

Pending before the Court is an appeal for judicial review of a final administrative decision of an Administrative Law Judge ("ALJ") with the Arizona Office of Administrative Hearings under the Individuals with Disabilities Education Act.  For the following reasons, the ALJ's decision is affirmed in part and reversed in part.[1]

## BACKGROUND

Plaintiff E.D. ("Student") is a minor child who resides with Tina Salata Decelles ("Mother") in Maricopa County, Arizona. (Doc. 1 at 2).  Student has a disability that qualifies her for special education and related services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  (Doc. 1 at 2).  Congress enacted the IDEA, in part, "to ensure that all children with disabilities have available to them a free appropriate public education [or 'FAPE'] that emphasizes special education

---

[1]    Plaintiff's request for oral argument is denied because the parties have had an adequate opportunity to discuss the law and evidence, and oral argument will not aid the Court's decision.  *See Lake at L.V. Invs. Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

"The IDEA focuses on making a FAPE available to disabled students through development of Individualized Education Programs ('IEPs')." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1202 (9th Cir. 2016) (citations and footnote omitted). "An IEP is a comprehensive plan collaboratively prepared by a child's 'IEP Team' (which includes teachers, school officials, and the child's parents), and must be drafted in compliance with a detailed set of procedures." *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 910 (9th Cir. 2020) (citing *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017)); *see also* 20 U.S.C. § 1414(d). The IEP "consists of a written statement setting forth the special services and aids the child needs to get a FAPE." *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 847 (9th Cir. 2016) (citing 20 U.S.C. §§ 1401, 1414).

### A.  Student's Enrollment at Zaharis and the Legacy IEP

Student enrolled in third grade at Zaharis Elementary School ("Zaharis") in Defendant Mesa Unified School District (the "District") in August 2023. (Doc. 22 at 7). Student had previously been enrolled at Legacy Traditional School ("Legacy"), a charter school. (*Id.*). While at Legacy, Student was placed on an IEP. (*Id.*). Student's IEP at Legacy (the "Legacy IEP") provided Student with the following specially designed instruction, implemented in a special education classroom, totaling 2.5 hours of "pull-out"[2] instruction each week:

- Basic reading for 60 minutes each week (30 minutes, twice a week);
- Math for 60 minutes each week (30 minutes, twice a week); and
- Written expression for 30 minutes each week (30 minutes, once a week).

---

[2]  "Pull-out" educational services are provided outside of the general education setting (e.g., in a special education classroom or through individual instruction), whereas "push-in" educational services are provided in a general education setting (i.e., in a classroom with non-disabled peers).

(Doc. 1 at 22; IR 124 at 19).[3]  The Legacy IEP further outlined three "direct"[4] therapy services:

- Occupational therapy ("OT") for 90 minutes each month (30 minutes, three sessions each month);

- Physical therapy ("PT") for 90 minutes each month (30 minutes, three sessions each month); and

- Speech therapy for 240 minutes each month (30 minutes, twice a week).

(Doc. 1 at 22; IR 124 at 19).  Finally, the Legacy IEP outlined certain services and requirements for Student within the general classroom setting, which included:

- Reading comprehension for 60 minutes each week through "push-in" instruction (60 minutes, once a week);

- Requirement that Student spend at least 80% of her day inside a general education classroom with general education peers;

- Paraprofessional support and modified curriculum, assignments, and assessments to allow Student to access general curriculum at her instructional level; and

- Twenty different academic accommodations, such as "preferential seating," "simplification of directions," and "testing accommodations."

(Doc. 1 at 22; IR 124 at 19-20).  Student's parents ("Parents") provided District staff at Zaharis with Student's Legacy IEP upon her enrollment.  (Doc. 22 at 7).  The District conducted an IEP transfer review process, and it determined that it would implement the Legacy IEP "with comparable services and accommodations/modifications to the fullest extent possible until a new IEP was developed."  (Doc. 1 at 23 (citation modified)).

**B.    The District's Update to the Legacy IEP**

At the start of Zaharis's school year, which began on August 3, 2023, Student's special education teacher, Julie Cooper, assessed Student's reading abilities and determined that Student could not decode words and had not mastered letter-sound

---

[3]    "IR" refers to the "Index of Record on Review" as a part of the complete Administrative Record on Review.  The page numbers cited by the Court do not reflect any paginations that may appear at the bottom of the pages within each record and instead reflect the order in which that page appears within each specific document (for example, (IR 130 at 12) refers to the twelfth page of IR 130, which is a sixteen-page document).
[4]    "Direct" services are provided in a one-on-one or small group setting.  (*See* IR 124 at 19).

correspondence. (*Id.* at 24). On August 31, 2023, Mother met with Cooper and Student's general education teacher, Afton Zapata-Scow. (*Id.* at 26). At the meeting, Cooper relayed her belief to Mother that the services outlined in the Legacy IEP were not meeting Student's needs. (*Id.*). Mother articulated that her goal for Student at Zaharis was to "catch up to her peers in an inclusive setting." (*Id.*). In response, Cooper stated that Student's instructional minutes would need to be increased if Student were to catch up to the academic level of her peers. (*Id.*). Cooper also stated that she would increase Student's service times, collect data on Student's progress, and schedule an IEP meeting to write a new IEP for Student. (*Id.*).

The IEP meeting was held on November 14, 2023. (Doc. 22 at 10). Present at the meeting were Parents, Cooper, and Julie Bartanen, special education director in the District who oversaw special education at Zaharis. (Doc. 1 at 29). The purpose of the meeting, according to Cooper, was to formalize increases in pull-out instruction that were already being provided to Student and obtain additional adult instructional support for Student. (*Id.*). Cooper presented Parents with an updated and *incomplete* IEP (the "Draft IEP") that included the following increased levels of pull-out services, totaling 7 hours of pull-out instruction each week—nearly three times the amount of pull-out instruction set forth in the Legacy IEP:

- Reading comprehension for 60 minutes each week;
- Reading decoding for 120 minutes each week;
- Written expression for 120 minutes each week;
- Math problem-solving for 60 minutes each week; and
- Math calculation for 60 minutes each week.

(*Id.* at 30, 33). These pull-out services were all to be implemented in a special education classroom. (*Id.* at 36). Furthermore, the Draft IEP *removed* the 90 minutes of direct PT services provided in the Legacy IEP. (*Id.* at 33).

The Draft IEP also modified Student's least restrictive environment ("LRE") requirements. (*Id.* at 33-34). The IDEA requires that children with disabilities must, "[t]o

the maximum extent appropriate," be "educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). This "least restrictive environment requirement" reflects "IDEA's strong preference for educating children with disabilities alongside their non-disabled peers." *D.R. ex rel. R.R. v. Redondo Beach Unified Sch. Dist.*, 56 F.4th 636, 641 (9th Cir. 2022). The Draft IEP—instead of requiring Student to spend at least 80% of her day inside a general education classroom with her non-disabled peers—only mandated that Student spend a minimum of 40% and a maximum of 79% of her day inside a general education classroom. (Doc. 1 at 33-34). The Draft IEP allowed for instruction in a general education setting only when Student was not "receiving instruction in the resource setting for reading, writing, and mathematics," citing Student's "significant delays in all academic areas." (IR 130 at 16).

Though Parents were handed copies of the Draft IEP at the outset of the IEP meeting, the provisions in the document detailing the increase in pull-out services and the changes to Student's LRE were not actually discussed at the meeting. (Doc. 1 at 34). Instead, the topics of discussion at the meeting included Student's general progress at Zaharis, recommendations for alternative programs at different schools, and the merits of instructional aide support. (*Id.* at 30-33). Parents and the District employees scheduled a second IEP meeting, to discuss the remaining IEP provisions, for December 13, 2023. (*Id.* at 34-35). Mother believed that the Legacy IEP would continue to remain in effect until the December meeting. (*Id.* at 35).

But the District, without convening any further with Parents, implemented a modified version of the Draft IEP (the "Modified IEP") soon after the November meeting. (*Id.* at 35-37). On November 20, 2023, the District mailed the Modified IEP to Parents. (*Id.* at 36). The Modified IEP kept the Draft IEP's provisions regarding the increase in pull-out services for Student in a special education classroom. (*Id.*). On November 21, 2023, Cooper emailed Mother a prior written notice[5] that detailed the changes made to Student's IEP, stating that "[t]he IEP team has decided to implement the attached IEP."

---

[5]    The prior written notice was dated November 8, 2023.

(*Id.*; IR 132 at 3).   Such notice, under the IDEA, must be sent to parents *before* "an educational agency proposes, or refuses, to initiate or change the educational placement of a disabled child."  *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994); 34 C.F.R. § 300.503(a).  The prior written notice also stated that "the team will reconvene in December to determine the best placement for [Student] to receive her specially designed instruction."  (IR 132 at 4).

### C.    Due Process Petition, Resolution Sessions, and Unilateral Services

On December 4, 2023, Parents filed a due process petition on behalf of Student with the Arizona Office of Administrative Hearings through the Arizona Department of Education, pursuant to 20 U.S.C. § 1415(f).  Parents alleged that the District's decision to implement the Modified IEP violated Student's and Parents' right to a FAPE in the LRE under the IDEA.  (IR 1 at 2).  Parents primarily sought to halt implementation of the Modified IEP while ensuring that the Legacy IEP continued to stay in effect while Student remained at Zaharis.  (*Id.* at 16-18).  Parents indicated in their petition that they would be "unilaterally" placing Student at another educational program, claiming that District staff were "not trained to implement an inclusive IEP and, as such, Student needs a new placement with more accepting and trained staff."  (*Id.* at 16).

In light of Parents' decision to file a due process petition, the IEP follow-up meeting scheduled for December 13, 2023, was cancelled.  (Doc. 1 at 44).  The parties then met virtually for two resolution meetings, as provided by the IDEA, in hopes of resolving the dispute without a hearing.  *See* 20 U.S.C. 1415(f)(1)(B); 34 C.F.R. § 300.510; (IR 109 at 81-122).   At the first resolution meeting—on December 19, 2023—Mother and her attorney, Amy Langerman, were present and raised concerns with the Modified IEP.  (IR 74 at 8).  Langerman, stating that her clients had "lost trust" in the District's IEP team, requested that the District retain and pay the expenses for a private inclusion specialist—Sherry Mulholland—and allow Langerman herself to train District staff on inclusion.  (*Id.* at 8; IR 109 at 82).  The District rejected Langerman's training requests.  (IR 109 at 82). However, the District proposed a new IEP (the "December Settlement IEP") that otherwise

incorporated Plaintiff's concerns with the Modified IEP. (*Id.*). The December Settlement IEP increased Student's LRE to at least 80%, stating that Student would only receive pull-out instruction for "speech/language, reading/decoding and math instruction" due to Student's "unique needs," and that Student would otherwise be "fully included for the rest of the school day" in the general classroom setting with the help of "supplementary aides and services." (*Id.* at 82, 100).

But on January 4, 2024, Parents filed an amended due process petition. (IR 74 at 9). The District held a second resolution meeting with Mother and Langerman on January 19, 2024, where they raised concerns with the December Settlement IEP. (*Id.*). Langerman reiterated her requests that the District retain and pay the expenses for a private inclusion specialist (Mulholland) and allow Langerman to train District staff on inclusive practices. (*Id.*). While the District again rejected Langerman's requests, it rewrote the IEP again (the "January Settlement IEP") to respond to concerns raised at the second resolution meeting and offered to pay reasonable attorney's fees. (IR 109 at 102-22). The January Settlement IEP maintained the reduced hours in pull-out services and the 80% LRE requirement present in the December Settlement IEP. (*Id.*).

Parents did not respond to the District's settlement offers. (IR 74 at 10). Student's last day at Zaharis was on December 14, 2023. Parents homeschooled Student before enrolling her at Tempe Montessori School at the end of January 2024. (Doc. 22 at 12). Parents also retained a special education teacher to provide specially designed instruction in reading and math outside of the school day, for two hours a week, as was set out in the Legacy IEP. (*Id.*). Student's private special education teacher noted an improvement in Student's reading progress while at Tempe Montessori. (*Id.* at 12-13). Student received OT, PT, and speech therapy services—as outlined in the Legacy IEP—through the Division of Developmental Disabilities with the Arizona Long Term Care System. (*Id.* at 12).

Parents retained Mulholland as an "inclusion specialist" to provide "training and recommendations at Tempe Montessori." (*Id.* at 13). Mulholland conducted an onsite observation of the school and a virtual observation of Student's private special education

tutoring.  (*Id.*).   Mulholland observed Student during one of her classes at Tempe Montessori and noted that Student had made "phenomenal gains" with her reading abilities and was demonstrating a high level of engagement and executive functioning.  (*Id.*)

**D.     Due Process Hearing**

The due process hearing with the ALJ was held from March 11-14 and April 2-3, 2024.  (Doc. 1 at 15).  Plaintiff raised four issues at the hearing:

(1) Whether the District denied parental participation resulting in a substantive denial of FAPE at the IEP meeting on November 14, 2023;

(2) Whether the Modified IEP would provide a FAPE to Plaintiff in the LRE;

(3) Whether the District removed Plaintiff from a general education setting in excess of the amount of time identified by the Legacy IEP or otherwise did not implement the Legacy IEP as it was written—denying FAPE to Plaintiff; and

(4) Whether the District discriminated against Plaintiff by denying Plaintiff equal access to the District's general education programs.

(*Id.* at 16).  Plaintiff asked the ALJ to issue an order:

(1) Preventing the District from implementing the Modified IEP and mandating that the District implement the Legacy IEP;

(2) Finding that the District did not substantially implement the Legacy IEP, and thus denied a FAPE to Student, as well as determining the extent of the non-implementation of the Legacy IEP;

(3) Determining that the District predetermined Student's educational placement and services in the Modified IEP and implemented them without prior written notice, which constituted a denial of parental participation and a substantive denial of FAPE;

(4) Holding that the Modified IEP will not provide Student a FAPE and will not place Student in the LRE and cannot be implemented;

(5) Requiring consultation and training by an outside inclusion specialist for Student's IEP team, including monthly follow-up support for Student from that

specialist for a full school year;

(6) Mandating in-person legal training of Student's IEP team on issues of LRE, prior written notice, predetermination, push-in services, and FAPE; and

(7) Reimbursing Parents for any expenses associated with any unilateral placement of Student that Parents may make (such as private school, homeschooling, etc.).

(*Id.* at 17-18).

The ALJ issued her decision on June 5, 2024, concluding:

> The evidentiary record demonstrates that the District committed procedural violations of the IDEA that significantly impeded Parents' opportunity to participate in the decision-making process, and thereby denied Student a FAPE. The District predetermined placement/services and implemented them without prior written notice which denied parental participation and is a substantive denial of FAPE. The evidentiary record further demonstrates that the [Modified IEP] fails to provide a FAPE to Student.

(Doc. 1 at 69). The ALJ ordered that Student's Legacy IEP remain in place, barred the District from implementing the Modified IEP, and instructed the District to complete a new IEP as soon as possible. (*Id.* at 70). For remedies, the ALJ ordered the District to fund 60 minutes of direct PT to Student from a private provider, but denied all other requested relief, including Plaintiff's request for reimbursement of expenses associated with the unilateral placement of Student at Tempe Montessori due to lack of sufficient evidence indicating whether placement was appropriate. (*Id.* at 69-70).

### E. Issues on Appeal

On appeal, Plaintiff raises two issues. First, Plaintiff contends that the ALJ failed to consider and decide issues raised in the due process petition, thus denying Parents their "guaranteed right of impartial review" under the IDEA. (Doc. 22 at 5, 7). Plaintiff identifies four sub-issues that the ALJ purportedly failed to analyze when deciding the due process petition:

(a) Whether the unilateral increase in the amount of pull-out services provided to Student constituted a denial of FAPE;

(b) Whether the District materially failed to implement required services for reading comprehension and basic reading of sight words;

(c) Whether the District materially failed to implement required services for physical and occupational therapy; and

(d) Whether the location of services identified in the Modified IEP violated Student's right to be educated in the LRE.

(*Id.* at 14-25).

Second, Plaintiff argues that the ALJ erred in concluding that there was insufficient evidence to conclude that Parents' unilateral placement of Student at Tempe Montessori was "appropriate." (*Id.* at 25-29). Plaintiff argues that Parents had a right to reimbursement because their rights under the IDEA were violated. (*Id.* at 25).

## LEGAL STANDARD

In judicial review under the IDEA, district courts employ a modified form of de novo review. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471-72 (9th Cir. 1993). The Court reviews de novo whether a school district's proposed IEP provided a FAPE under the IDEA. *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1118 (9th Cir. 2016) (citation omitted). "However, complete de novo review of the administrative proceeding is inappropriate." *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007) (citation modified). Mixed questions of law and fact are reviewed de novo unless the question is primarily factual. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987).

"Due weight" must be given to the ALJ's factual findings, and courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* (citations omitted). "The amount of deference accorded [to] the [ALJ's] findings increases where they are thorough and careful." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (internal quotation marks and citation omitted). If an ALJ fails to "address all issues and disregard[s] some of the evidence presented at the hearing," then the ALJ's findings are "neither thorough nor careful." *M.C.*

*ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194-95 (9th Cir. 2017). A federal court bases any decision to issue relief on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C).

### DISCUSSION

### I. ALJ's Failure to Rule on Issues Raised in the Due Process Petition

Plaintiff identifies four issues raised during the administrative proceedings that were not addressed by the ALJ. The Court addresses each in turn.

### A. Whether the District's Unilateral Increase in the Amount of Pull-Out Services Provided to Student Resulted in a Denial of FAPE

Plaintiff first argues that the ALJ failed to address whether the District's implementation of the Modified IEP on November 14, 2023, resulted in a denial of FAPE. (Doc. 22 at 17). In particular, Plaintiff claims that the District's failure to discuss the increase in Student's pull-out services at the IEP meeting or provide Parent with prior written notice of the increases *before* implementation "denied meaningful parental participation in the decision-making process," thus constituting a denial of FAPE. (*Id.*). As a remedy, Plaintiff requested that the ALJ require the District to provide Student with two weeks of a parent-selected summer camp program (representing the period from November 14, 2023, through the end of the school semester in mid-December 2023), with full reimbursement for tuition and transportation. (*Id.* at 19). The ALJ did not grant this remedy, and Plaintiff renews that request here.[6]

"When formulating an IEP, a school district must comply both procedurally and substantively with the IDEA." *Antelope Valley*, 858 F.3d at 1194 (citation modified). Under the IDEA, there are a number of "procedural safeguards that are designed to protect the rights of disabled children and their parents." *Id.* at 1195 (citing 20 U.S.C. § 1415). One such right is the right of parental participation. *Amanda J. v. Clark Cnty. Sch. Dist.*,

---

[6] The ALJ recognized that Cooper informed Mother on August 31, 2023, that she would increase Student's service times, collect data on Student's progress, and schedule an IEP meeting to write a new IEP. (Doc. 1 at 26). Plaintiff, in her appeal, does not argue that any increase in services beginning on August 31 constituted a procedural violation of the IDEA by denying meaningful parental participation.

267 F.3d 877, 892 (9th Cir. 2001) ("Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA."). A "unilateral amendment" to a student's IEP constitutes a "per se procedural violation of the IDEA because it vitiates the parents' right to participate at every step of the IEP drafting process." *Antelope Valley*, 858 F.3d at 1197 (footnote omitted).

Not all procedural harm is actionable under the IDEA. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2009). However, procedural deficiencies that "seriously infringe the parents' opportunity to participate in the IEP formulation process[] clearly result in the denial of a FAPE." *Id.* (citation omitted); *id.* at 910 (district courts must "consider whether the procedural error . . . *significantly restricted* parental participation" (emphasis added)); *D.O. ex rel. Walker v. Escondido Union Sch. Dist.*, 59 F.4th 394, 417 (9th Cir. 2023); 20 U.S.C. § 1415(f)(3)(E)(ii)(II). If "a parent is unaware of the services offered to the student—and, therefore, can't monitor how these services are provided—a FAPE has been denied." *Antelope Valley*, 858 F.3d at 1198.

If a student is denied a FAPE, the district court has discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). In situations where a student was denied a FAPE due to a significant deprivation of the parents' right to participate in the IEP process, plaintiffs, "[a]t the very least," "are entitled to have the District draft a proper IEP and receive compensatory education to place [the student] in the same position [she] would have occupied but for the school district's violations of the IDEA." *Antelope Valley*, 858 F.3d at 1201 (citation modified). "[I]t may be a rare case when compensatory education is not appropriate to remedy an IDEA violation." *R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011) (internal quotation marks and citation omitted).

Here, there was a procedural violation of the IDEA. Through the District's unilateral implementation of the Modified IEP on November 14, 2023, which nearly tripled the amount of pull-out instruction set forth in the Legacy IEP and lowered the Student's LRE requirement, the District denied Mother her ability to participate in the IEP

formulation process.  The District did not offer Mother the ability to participate "at every step of the IEP drafting process"—given that the District predetermined the increase in pull-out services in the Modified IEP without first consulting Parents—and thus Mother "suffered procedural harm by not being apprised of the actual status of the services being provided" to Student.  *Antelope Valley*, 858 F.3d at 1197-98.

The procedural violation denied Student a FAPE.  As the ALJ held, the "the District *significantly impeded* the parents' opportunity to participate in the decision-making process when it locked in and finalized an unfinished IEP and began implementing the IEP immediately following the November 14, 2023 meeting." (Doc. 1 at 52 (emphasis added)). The ALJ's reasoning on this point was thorough and careful, and it is entitled to due weight. The ALJ pointed to the testimony from the District's assistant superintendent of student services confirming that the District should not have implemented the Modified IEP without first discussing the increase in pull-out services and Student's LRE placement with Parents—which did not occur at the November 14, 2023 meeting.  (*Id.*).  Yet the special education director (Bartanen) began implementing the Modified IEP *before* the follow-up IEP meeting in December 2023, which "stripped the Parents of their ability to timely exercise their procedural rights and stop [its] implementation." (*Id.*).  The District's failure to involve Mother in the implementation of the Modified IEP "clearly infringed on [her] ability to participate in the IEP formulation process," a reason that, alone, "is cause to conclude that [Student] was denied a FAPE."  *See Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1047 (9th Cir. 2013).

The ALJ erred, however, in not considering whether to award Plaintiff a remedy for her denial of FAPE based on the violation of Mother's procedural rights.  As to this issue, the ALJ's decision was deficient.  The ALJ, after concluding that the District significantly impeded the Parents' opportunity to participate in the IEP decision-making process based on the evidence provided at the hearing, seemingly contradicted herself in the next paragraph, stating that "Petitioner has failed to establish that the District significantly impeded Parents' opportunity to participate in the decision-making process." (Doc. 1 at

52-53). But in her conclusion, the ALJ again affirmed that "[t]he evidentiary record demonstrates that the District committed procedural violations of the IDEA that *significantly impeded* Parents' opportunity to participate in the decision-making process, and thereby denied Student a FAPE." (*Id.* at 69 (emphasis added)). Nonetheless, the ALJ conducted no analysis on whether Plaintiff's proposal of a two-week summer camp with non-disabled peers would remedy Plaintiff's denial of FAPE.

Plaintiff's proposed summer camp remedy is equitable as a form of compensatory education that would place Student in the same position she would have occupied, but for the District's violation of the IDEA. A central tenant of the IDEA is to ensure that children with disabilities have "access to the general education curriculum in the regular classroom." 20 U.S.C. § 1400(c)(5). The IDEA requires that, to "the maximum extent appropriate, children with disabilities" should be "educated with children who are not disabled." *Id.* § 1412(a)(5)(A). Evidence from the hearing indicated that Student had been receiving increased pull-out services for at least two weeks. (Doc. 22 at 15; IR 68 at 5). Thus, for at least two weeks, Student was deprived of, to at least some extent, the opportunity to learn in a general education setting with non-disabled peers at the rate set forth in the Legacy IEP. A remedy placing Student in an educational setting with her non-disabled peers is appropriate.

With regard to Plaintiff's summer camp remedy, Plaintiff is directed to identify in supplemental briefing to the Court her desired summer camp for summer 2026, provide the cost of the camp, and justify why two full weeks (rather than a shorter period, such as one full week) of a reimbursed program is appropriate. Defendant may respond.

**B.     Whether the District Materially Failed to Implement Required Services for Reading Comprehension and Basic Reading of Sight Words**

Plaintiff next argues that the ALJ did not address her claim that the District failed to implement certain services required under the Legacy IEP. (Doc. 22 at 20). Plaintiff highlights that, under the Legacy IEP, she was entitled to (a) 60 minutes per week of push-in instruction in reading and listening comprehension and (b) 60 minutes per week of pull-

out instruction in basic reading to work on "phonetic decoding" and "reading sight words."[7] (*Id.*).  Plaintiff contends that evidence from the hearing demonstrated that the District failed to provide the 60 minutes of push-in reading comprehension per week, nor did it provide any pull-out services specifically on sight word instruction.  (*Id.*).  As a remedy, Plaintiff requests 20 hours of compensatory services in reading tutoring from a credentialed teacher of Mother's choice.  (*Id.* at 20-21).

A plaintiff under the IDEA has a claim against a school district for failing to implement portions of an IEP only if that failure was "material."  *Van Duyn*, 502 F.3d at 815.  "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP."  *Id.* at 822.  This standard "does not require that the child suffer demonstrable educational harm in order to prevail," but a "child's progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided."  *Id.*  Plaintiff bears the burden of proof in demonstrating that a failure to implement IEP services was material.  *Id.* at 819-20.  A material failure to implement part of an IEP is a denial of FAPE, and a court can issue compensatory relief to remedy the harm caused.  *See id.* at 822; 20 U.S.C. § 1415(i)(2)(C)(iii).

Though Plaintiff raised the issue in her post-hearing brief (*see* IR 68 at 51-52), the ALJ did not analyze whether there was a material failure to provide the required reading services.  Thus, the Court addresses this issue de novo.

Under the Legacy IEP, Plaintiff was entitled to 60 minutes per week of specially designed instruction for reading comprehension in the general education setting.  (Doc. 22 at 7-8; IR 124 at 19).  Additionally, Plaintiff was supposed to receive 60 minutes per week of "basic reading" in a pull-out setting, where such sessions were supposed to consist of "specialized instruction in sounding out cvc words[8] and learning sight words."  (IR 124 at

---

[7]    "Sight words are common words that schools expect kids to recognize instantly. Words like *the*, *it*, and *and* appear so often that beginning readers reach the point where they no longer need to try to sound out these words."  Julie Rawe, *What are sight words?*, Understood, https://www.understood.org/en/articles/what-are-sight-words (last visited March 4, 2026).

[8]    "CVC words are three letter words that follow one simple pattern: consonant-vowel-

19).  However, Student, during her 18 weeks of attendance at Zaharis, received a total of 120 minutes per week of pull-out reading instruction from the specially designed instruction special education teacher at Zaharis, Lindsey Johnson.  (Doc. 1 at 25-26).  Johnson provided instruction to Student specifically aimed at developing Student's skills in letter-sound correspondence (i.e., working on sounding out cvc words).  (Doc. 1 at 24).

At the hearing, Cooper testified that Johnson was responsible for implementing Student's sight word and reading comprehension goals.  (IR 197 at 23:3-24:6, 30:21-31:4; IR 219 at 280:13-17, 287:24-288:6).  But Johnson testified that she had not been implementing the sight word and reading comprehension goals, and that she believed that Cooper had been implementing them.  (IR 226 at 114:24-115:6).  Yet Cooper's schedule for the school year confirmed that Cooper only provided Student with instruction in written expression and math—not any instruction in reading.  (IR 188 at 15; *see also* IR 219 at 280:15-17 (Cooper testified:  "Ms. Johnson[] serviced Student in reading only.  I was the provider of services in written expression and math.")).

Plaintiff has thus met her burden in demonstrating that two provisions of the Legacy IEP—reading comprehension and sight word services—were not provided during her time at Zaharis.  This failure was more than a minor discrepancy—it was instead a wholesale departure from the terms laid out in the Legacy IEP.  By violating this "binding commitment" to Student, *Antelope Valley*, 858 F.3d at 1197, the District materially failed to implement required services for reading comprehension and sight words, and thus denied Student a FAPE.

Defendant argues that it provided Student with "services comparable to those set forth in the Legacy IEP," thus removing any need for compensatory relief.  (Doc. 23 at 8-9).  Defendant's contention misses the mark.  While the ALJ stated that "[b]etween August 3 and November 14, 202[3], the District provided the Student with services comparable to those set forth in her Legacy IEP," this factual finding relied exclusively on the opinions

consonant"—such as cat, red, and pig.  *See* Laurin Brainard, *What are cvc words?*, The Primary Brain (July 19, 2024), https://theprimarybrain.com/phonics/2024/07/19/What-Are-CVC-Words/.

of District staff that "comparable services [in the Legacy IEP] *could* be provided" at Zaharis. (Doc. 1 at 66-67 (emphasis added); *see also id.* at 23 ("On receipt of the Legacy IEP, the District determined that it would implement the IEP with comparable services and accommodations/modifications . . to the fullest extent possible until a new IEP was developed.")). But the District's belief that it could or did provide comparable services does not mean that it actually did so. The District points to no rebuttal evidence indicating that it did actually provide Plaintiff with reading comprehension and sight word services. (*See* Doc. 23 at 8-9). Plaintiff is thus entitled to compensatory relief.

Plaintiff is directed, in her supplemental brief, to identify the credentialed teacher that she proposes to provide reading tutoring, provide the tutor's hourly rate, and justify why 20 hours (as opposed to some other figure) of compensatory relief is appropriate.

### C.    Whether the District Materially Failed to Implement Required Services for Physical Therapy and Occupational Therapy

Third, Plaintiff contends that the ALJ did not address her claim that the District failed to implement required services for PT and OT under the Legacy IEP. (Doc. 22 at 21-22). The Legacy IEP required 90 minutes of direct PT services and 90 minutes of direct OT services per month (each for three sessions of 30 minutes per month) in a one-on-one or small group setting. (Doc. 1 at 22; IR 124 at 19). For the semester that Student attended Zaharis, Student was entitled to a total of 14 PT sessions and 14 OT sessions. (Doc. 22 at 9). Plaintiff avers that documentary evidence produced during the hearing established that the District failed to provide Student with nine PT sessions and eight OT sessions—yet the ALJ only issued a compensatory award for 60 minutes of PT services (two PT sessions). (*Id.* at 21-22). Plaintiff seeks additional compensatory relief for the remaining seven PT sessions and eight OT sessions. (*Id.* at 22).

Student, due to her disability, has diminished gross motor skills. (IR 68 at 27). Student, in January 2023, scored poorly on tests for body coordination and strength and agility. (*Id.*). Thus, the Legacy IEP included PT services to help Student address her gross motor delays. (IR 124 at 19). Yet the Draft IEP and Modified IEP eliminated all of Student's gross motor goals and direct PT services. (Doc. 1 at 60). The ALJ, noting that

Student had failed to make progress on her gross motor goals during her time at Zaharis and still had gross motor needs, held that the removal of the gross motor goals and direct PT services in the Modified IEP constituted a denial of FAPE. (*Id.* at 60-62). To remedy this violation, the ALJ ordered the District to fund 60 minutes of direct PT to Student from a private provider selected by Student, reasoning that the Legacy IEP required 90 minutes of direct PT per month, and Plaintiff had not received any PT services for over two weeks after the Modified IEP was implemented. (*Id.* at 70). The ALJ's findings and remedy here are not at issue in this appeal.

However, at the due process hearing, a related but separate issue was raised as to whether the District materially failed to implement the direct PT and OT services required in Student's *Legacy* IEP during her full time at Zaharis. (Doc. 22 at 9). The ALJ ordered the District to produce Medicaid billing records indicating the range of such services actually provided to Student. (*Id.*). The records were produced, and Plaintiff discussed them in her post-hearing brief. (IR 68 at 52-53). According to Plaintiff, while the Legacy IEP required 14 direct PT sessions and 14 direct OT sessions (for 30 minutes each), the Medicaid billing records instead demonstrate that Student only received two full PT sessions and three full OT sessions. (*Id.* at 53). Student also received six sessions in a "co-treating model," where both PT and OT services were rendered, but only for a combined time of 30 minutes each session—rather than one full hour.[9] (*Id.*). Student, thus, did not receive the equivalent of *nine PT sessions* and *eight OT sessions*, as demonstrated below:

| Service Type | Amount Required by Legacy IEP | Actual Services Received at Zaharis | Required Sessions Not Provided |
|---|---|---|---|
| Physical Therapy (PT) | **420 minutes** (14 sessions × 30 min/session) | **150 minutes** (2 full sessions × 30 min/session) + (6 partial sessions × 15 min/partial session) | **Nine sessions** (270 min not provided ÷ 30 min/session) |

---

[9]    Plaintiff remarks that "[a]ny time that PT and OT co-treated, Student was deprived of 15 minutes of OT and 15 minutes of direct PT. The records reflect that on 6 service dates, Student was being shortchanged because of the co-treating model." (IR 68 at 53).

| Occupational Therapy (OT) | 420 minutes (14 sessions × 30 min/session) | 180 minutes (3 full sessions × 30 min/session) + (6 partial sessions × 15 min/partial session) | Eight sessions (240 min not provided ÷ 30 min/session) |
|---|---|---|---|

Based on the Medicaid billing records introduced at the hearing (IR 188 at 11-13, "Student's Exhibit 78"), the District materially failed to provide direct PT and OT services required under the Legacy IEP, thus denying Student a FAPE. *See Van Duyn*, 502 F.3d at 822. As was the case for the lack of reading comprehension and sight word services, the District's failure to provide nine full PT sessions and eight full OT sessions resulted in a substantial non-implementation of services. Student needed these services to improve both her gross motor (PT) and fine motor (OT) skills. (*See* IR 124 at 5). By failing to provide the PT and OT services, the District violated the IDEA.

Defendant does not seriously contest Plaintiff's assertion here based on the Medicaid billing records. Instead, Defendant briefly mentions that the ALJ awarded Student 60 minutes of PT as a remedy, and "did not see reason to award" Plaintiff's requested remedy for seven PT sessions and eight OT sessions. (Doc. 23 at 9). But the ALJ did not analyze whether there was a material failure to provide the required PT and OT services under the Legacy IEP, *prior* to the implementation of the Modified IEP. Thus, the ALJ did not award Plaintiff's remedy because the ALJ failed to consider the issue altogether in her decision—even though Plaintiff raised the issue in her post-hearing brief. Hence, there was no thorough or careful reasoning by the ALJ justifying the denial of Plaintiff's requested remedy.

The Court, however, cannot yet issue an award before further clarification from Plaintiff. The Medicaid billing records plainly demonstrate that Student received far less than the amount of PT and OT services required. (IR 188 at 11-13). However, the Court is unable to match the individual entries in the billing records with Plaintiff's description of the records. For example, the Court cannot with full certainty identify the two full sessions of PT and the three full sessions of OT, the six sessions provided in a co-treating

model, or discern the meaning of the service codes listed (such as "M – 97150" or "NB – 99999"). The Court will require Plaintiff, in her remedies brief, to identify with particularity the PT and OT services actually provided to Student at Zaharis before issuing any compensatory relief.

### D. Whether the Location of Services Identified in the Modified IEP Violated Student's Right to be Educated in the LRE

Fourth, Plaintiff avers that the ALJ did not consider Plaintiff's claim that the location of services set forth in the Modified IEP—outside of the general classroom—violated Student's right to be educated in the LRE and thus constituted a denial of FAPE. (Doc. 22 at 22-23). The ALJ determined that the increased amount of pull-out services in the Modified IEP did not constitute a denial of FAPE in the Student's LRE because "Student was not making progress on her IEP goals" and thus needed "additional service minutes." (Doc. 1 at 52). Plaintiff, however, does not challenge whether the additional services were necessary—instead, she argues that the ALJ failed to consider whether such services needed to be provided in a *pull-out* setting. (Doc. 22 at 22; Doc. 24 at 12). In other words, she contends that the same services could have been provided in the general education classroom.

Plaintiff seeks declaratory relief stating that the Modified IEP did not provide Student with a placement in her LRE, thus denying her a FAPE. (Doc. 22 at 25). But the ALJ, in her decision, already stated that the Modified IEP failed to provide a FAPE to Student due to the violation of Parents' procedural rights. (Doc. 1 at 69). The ALJ barred the District from implementing the Modified IEP. (*Id.* at 70). Thus, even if the Court were to separately hold that Modified IEP also violated Student's right to be educated in the LRE, "resolving this claim would not change the result in this case," and the Court thus "decline[s] to decide this issue." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 966 n.13 (9th Cir. 2017).

## II. Mother's Unilateral Placement of Student at Tempe Montessori

Plaintiff, upon rejecting the District's settlement offers, left Zaharis and enrolled at Tempe Montessori in January 2024. The ALJ denied Plaintiff's request for reimbursement

of tuition and fees ($5,757.00), private tutoring expenses ($1,520.00), inclusion consultation expenses ($736.00), and transportation costs ($3,044.29) incurred while Student attended Tempe Montessori from January to May 2024. (Doc. 1 at 69-70). Plaintiff renews her request on appeal. The Court affirms the ALJ's denial of Plaintiff's request for reimbursement.

Under the IDEA, parents can only receive reimbursement from a school district for unilaterally placing their child in a private educational program if they can demonstrate that (1) "the school district violated the IDEA" by failing to provide a FAPE and (2) "the alternative private placement they chose was proper." *Redondo Beach Unified Sch. Dist.*, 56 F.4th at 647 (citing *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) and 20 U.S.C. § 1412(a)(10)(C)). An alternative placement is considered "proper" under the IDEA "if the education provided by the private school is reasonably calculated to enable the child to receive educational benefits." *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 11 (1993) (internal quotation marks and citation omitted). Parents must "demonstrate that the placement provide[d] educational instruction specially designed to meet the unique needs" of their child. *Garden Grove Unified Sch. Dist.*, 635 F.3d at 1159 (citation omitted).

If both requirements are met, then the Court "must exercise its broad discretion and weigh equitable considerations to determine whether, and how much, reimbursement is appropriate." *Id.* (citation modified). "Relevant factors include the existence of more suitable placements for the student and the parties' level of cooperation during the IEP process." *Redondo Beach Unified Sch. Dist.*, 56 F.4th at 647 (citing *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1058-59 (9th Cir. 2012)). The Supreme Court has cautioned "that parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985).

As the ALJ held, and now this Court has held, Defendant violated the IDEA by

denying Student a FAPE under the Modified IEP.  The first requirement for reimbursement is thus met.  However, Plaintiff has not demonstrated on appeal, by a preponderance of the evidence, that the placement at Tempe Montessori was "proper."  The ALJ, in denying Plaintiff's request for reimbursement, found that Plaintiff "did not submit any evidence of the type of curriculum followed by the school and whether the curriculum was allowing Student to make progress or would even be effective to allow Student to make progress." (Doc. 1 at 69).

Plaintiff fails to point to any evidence introduced at the hearing indicating what "educational instruction" she received at Tempe Montessori that was "specially designed to meet [her] unique needs."  *See Garden Grove Unified Sch. Dist.*, 635 F.3d at 1159 (citation omitted).  Instead, Plaintiff highlights the testimony of Mulholland, who believed that Student's placement at Tempe Montessori was appropriate and provided Student with a FAPE.  (Doc. 22 at 13; IR 197 at 166:4-12).  Parents retained Mulholland to conduct an on-site observation at Tempe Montessori; at the visit, Mulholland observed that Student was actively engaged, demonstrated a high level of executive functioning skills, and was engaged with her peers.  (IR 197 at 161:7-166:3).  Mulholland testified that she believed that Student made "phenomenal gains" in her phonics ability, yet later clarified that she was "only [] making a guess that [Student] had made phenomenal gains" during her time at Tempe Montessori.  (*Id.* at 130:10, 169:14-19).

Mulholland did not have personal knowledge of the specific type of curriculum offered to Student at Tempe Montessori.[10]  She only knew that the Montessori school used the "Montessori-based curriculum."  (*Id.* at 197:22).  But such a conclusory statement, without explaining the type of curriculum employed for Student, does not demonstrate that Student actually received an educational instruction specially designed to meet her unique needs.

No staff member from Tempe Montessori testified at the hearing.  Nor did Student's

---

[10]    Nor did she have any personal knowledge of the curriculum utilized by Student's private tutor outside of Tempe Montessori.  (IR 197 at 192:5-9 (Mulholland confirmed that she "didn't have the chance to review any curriculum that the tutor was providing.")).

private tutor. Nor did Plaintiff produce any documentary evidence listing Student's curriculum. Plaintiff claims that there is no requirement for her to "'prove up' the specifics of curricular interventions in a unilateral placement," and that mere evidence that "the placement enable[d] [Student] to benefit educationally" is sufficient for a finding that the placement is proper. (Doc. 22 at 27). Plaintiff reads the law too loosely. While Plaintiff "need not show that a private placement furnishe[d] every special service necessary to maximize [her] potential," she must still demonstrate that "the placement provide[d] *educational instruction specially designed to meet* [her] unique needs," such that she benefitted from that instruction. *Garden Grove Unified Sch. Dist.*, 635 F.3d at 1159 (emphasis added and removed) (citation omitted). Plaintiff, while purporting to show the benefit, fails to adequately link such benefit with the actual educational instruction received.[11] And as Plaintiff describes, she was receiving private special education tutoring in reading and math *outside of* Tempe Montessori, while also receiving OT, PT, and speech therapy services through state programs. (Doc. 22 at 12-13).

Even if the unilateral placement at Tempe Montessori was deemed "proper," the Court, exercising its broad discretion, finds that reimbursement is still not appropriate here. Two factors weigh heavily against Plaintiff here. First, through the Settlement IEPs offered by the District in December 2023 and January 2024, there was a suitable placement at Zaharis that provided Student with a FAPE. After each of the resolution meetings, the District subsequently adopted terms proposed by Mother and her attorney that, among other items, increased Student's services in the general education setting, provided for PT and OT services to work on Student's gross motor and fine motor skills, and added one hour per day of personal care aide services in the general education classroom. (IR 74 at 22-

---

[11] Plaintiff cites to authority from the Sixth Circuit to support her claim that a showing of progress, alone, is sufficient for reimbursement of a private placement at a Montessori program. (See Doc. 22 at 26 (citing *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779 (6th Cir. 2018)). But even in that case, the parties introduced evidence of the specific curriculum that the child received at the Montessori school. *Hamilton Cnty. Dep't of Educ.*, 900 F.3d at 787-88. The Sixth Circuit noted that "the record is clear that [student] had a *personalized curriculum* at [Montessori school] and a paraprofessional aide dedicated just to him, such that he was working at his own pace with frequent repetition, intense one-on-one instruction, and repeated prompting and reinforcement." *Id.* at 797 (emphasis added).

30); *see also* 34 C.F.R. § 300.148(a) (a school district is not required to pay for student's private placement if it "made FAPE available to the child").

Second, Plaintiff did not demonstrate a high level of cooperation during the settlement process. During each of the resolution meetings, Plaintiff's attorney required that she be able to personally train District staff on inclusion, and that the District retain Mulholland as a private inclusion specialist. (IR 74 at 8-9). Such requests were not reasonable under the IDEA, which does not require "the furnishing of every special service necessary to maximize each handicapped child's potential." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 199 (1982); *see also KW v. Peninsula Sch. Dist.*, 2025 WL 1592450, at *17 (W.D. Wash. June 5, 2025) ("Although Parent may have preferred District staff receive different training, the IDEA does not obligate a school district to adopt a parent's preferred method for implementing their child's educational program."). Plaintiff also did not respond to either of the District's Settlement IEP offers. (IR 74 at 10). Through better cooperation, Plaintiff could have negotiated a better outcome with Defendant, potentially obviating the need for Student's placement at Tempe Montessori. The Court thus will not grant Plaintiff's request for reimbursement.

## CONCLUSION

The ALJ erred by failing to analyze three issues raised by Plaintiff, thus impeding Plaintiff's right to an impartial due process hearing under the IDEA. 20 U.S.C. § 1415(f). The ALJ's decision is thus reversed and modified with respect to those three issues. The ALJ's decision to deny reimbursement for Student's unilateral placement at Tempe Montessori, however, is affirmed.

**IT IS THEREFORE ORDERED** that the ALJ's decision is **AFFIRMED** in part and **REVERSED** in part.

**IT IS FURTHER ORDERED** setting forth the following briefing schedule on the issue of remedies:

1. Plaintiff shall file her supplemental brief on remedies by **April 14, 2026**. In her brief, which is not to exceed **eight (8) pages**, Plaintiff is directed to:

- 24 -

    a. Identify her desired summer camp for summer 2026, provide the cost of the camp, and justify why two full weeks (rather than a shorter period, such as one full week) of a reimbursed program is appropriate;

    b. Identify the credentialed teacher of her choice that will provide reading tutoring, provide the tutor's hourly rate, and justify why 20 hours (as opposed to some other figure) of compensatory relief is appropriate;

    c. Identify with particularity the PT and OT services actually provided to her at Zaharis, as detailed in Student's Exhibit 78; and

    d. Address whether she is the "prevailing party" in this action, such that attorney's fees should be awarded.

2. Defendant shall file its response to Plaintiff's brief on **April 28, 2026**. Defendant's response shall not exceed **eight (8) pages**.

3. No reply shall be permitted.

Dated this 30th day of March, 2026.

_____
G. Murray Snow
Senior United States District Judge